# EXHIBIT A

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 14 01085

Bryan P. Newell _____, *Plaintiff(s)*

v.

America's Servicing Company, A ., *Defendant(s)*
Division of Wells Fargo Bank, N.A.
and Harmon Law Offices, P.C.

### SUMMONS

To the above-named Defendant: Harmon Law Offices, P.C.

    You are hereby summoned and required to serve upon Josef Culik _____,
plaintiff's attorney, whose address is 18 Commerce Way Ste 2850, Woburn, MA 01801
an answer to the complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.

    Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.

    WITNESS, JUDITH FABRICANT, ESQUIRE    , at Norfolk _____ the twelfth _____

day of January _____, in the year of our Lord two thousand and fifteen _____

Clerk.

NOTES:
1.  This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2.  When more than one defendant is involved, the names of all such defendants should appear in the caption.
    If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

A TRUE COPY ATTEST

DEPUTY SHERIFF
Middlesex County

DATE OF SERVICE 1-16-15

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY OF NORFOLK | DOCKET NO. _____ |
|---|---|---|

| PLAINTIFF(S) Bryan P. Newell | DEFENDANT(S) AMERICA'S SERVICING COMPANY, A DIVISION OF WELLS FARGO BANK, N.A., AND HARMON LAW OFFICES, P.C. |
|---|---|

| Plaintiff Atty | Josef C. Culik | Type Defendant's Attorney Name |
|---|---|---|
| Address | 18 Commerce Way, Suite 2850 | Defendant Atty |
| City | Woburn  State MA  Zip Code 01801 | Address |
| Tel. | +1 (617) 830-1795   BBO# 672,665 | City   State   Zip Code |

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

CODE NO.      TYPE OF ACTION (specify)      TRACK            IS THIS A JURY CASE?

B99 Other Tort (specify) - Fast Track                        ( ● ] Yes   ( ) ] No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

## TORT CLAIMS
### (Attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses      $_____
    2. Total doctor expenses      $_____
    3. Total chiropractic expenses      $_____
    4. Total physical therapy expenses      $_____
    5. Total other expenses (describe)      $_____
                                Subtotal $_____
B. Documented lost wages and compensation to date      $_____
C. Documented property damages to date      $_____
D. Reasonably anticipated future medical expenses      $_____
E. Reasonably anticipated lost wages and compensation to date      $_____
F. Other documented items of damages (describe)      $_____

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
Violation of G.L. c. 93A by wrongful denial of mortgage modification and unlawful acceleration of note
                       Total $ 100,000.00

## CONTRACT CLAIMS
### (Attach additional sheets as necessary)
Provide a detailed description of claim(s):

                                           TOTAL   $............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT
N/A

I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods.

Signature of Attorney of Record _____   Date: Dec 10, 2014

A.O.S.C. 3-2007

COMMONWEALTH OF MASSACHUSETTS

COPY

NORFOLK, SS.

SUPERIOR COURT
C.A. NO.

14  01685

BRYAN P. NEWELL

    Plaintiff

v.

AMERICA'S SERVICING COMPANY,
A DIVISION OF WELLS FARGO
BANK, N.A., AND HARMON LAW
OFFICES, P.C.

    Defendants

**COMPLAINT AND
JURY DEMAND**

### NATURE OF THE CASE

1.    This is an action by the plaintiff-homeowner Bryan P. Newell against his mortgage servicer, America's Servicing Company and the foreclosure firm acting on its behalf, Harmon Law Offices, P.C. Newell's claims are for violation of the Consumer Protection Act, G.L. c. 93A, § 9, for unfair and deceptive business practices committed in the course of Newell's attempts to obtain a loan modification and unfair and misleading statements made to him during the course of the attempted foreclosure.

## PARTIES

2.     Plaintiff Bryan P. Newell ("Newell") is a natural person residing at 16 Edgemere Road, Quincy, Norfolk County, Massachusetts. Newell resides in the property at issue, which has not been formally foreclosed upon.

3.     Defendant America's Servicing Company ("ASC") is a division of Wells Fargo Bank, N.A., a national banking association with principal offices located in Sioux Falls, South Dakota. ASC is the servicer of Newell's home mortgage.

4.     ASC services Newell's mortgage on behalf an investor, U.S. Bank National Association, as Trustee for Credit Suisse First Boston Mortgage Acceptance Corp. Mortgage Pass-Through Certificates, Series 2006-1 ("U.S. Bank"). U.S. Bank is allegedly the owner of Newell's mortgage. U.S. Bank is a national banking association with principal offices located in Cincinnati, Ohio.

5.     Defendant Harmon Law Offices, P.C. ("Harmon") is a Massachusetts professional corporation with principal offices located at 150 California St., Newton, Massachusetts 02458. Harmon is the foreclosure firm that represented the ASC and U.S. Bank in the foreclosure process.

2

## COMMON FACTS

### Newell's Mortgage Difficulties

6.     Newell purchased his home, the property at issue, in 1984. He lives there with his wife, Tracey.

7.     In 2005, Newell refinanced his mortgage with a loan from SLM Financial Corporation in the amount of $160,000. The loan was secured by a mortgage on the property. The loan was for a term of 30 years with a fixed interest rate of 6%.

8.     Sometime after the loan was originated, servicing of the loan was transferred to ASC. ASC, as servicer on behalf of the investor who owns the mortgage, U.S. Bank, sends monthly mortgage bills, collects payments, and handles all interactions with Newell. ASC acts on behalf of U.S. Bank pursuant to a trust agreement called a Pooling and Servicing Agreement. This agreement contains the investor guidelines applicable to the loan. This agreement is publicly available through the Securities and Exchange Commission.

9.     Newell fell behind on his mortgage due to reduced hours at work, as well as a fire at the property and loss of a tenant.

10.     Now, however, Newell is gainfully employed and can afford to resume a modified mortgage payment. He works as a mechanical designer. His W-2 for showed his income for 2013 as $66,874. He also receives rental income, and his wife, Tracey, is employed.

**Both ASC and U.S. Bank Participate in**
**the HAMP Loan Modification Program**

11.     Loan modifications have been shown to benefit both borrowers and investors. Investors are losing mind-boggling sums of money on foreclosures. The available data suggests that investors lose ten times more on foreclosures than they do on modifications. *See, e.g., Home Foreclosures: Will Voluntary Mortgage Modification Help Families Save Their Homes?,* Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary, 111th Cong. 1, 4 (2009) (testimony of Alan M. White).

12.     In February 2009, President Obama announced the federal Home Affordable Modification Program ("HAMP"). HAMP is a national modification program aimed at helping millions of homeowners who are at risk of foreclosure by providing them with loan modifications that will reduce their monthly mortgage payments to sustainable levels. *See* Supplemental Directive 09-01, p. 1.[1] HAMP was created as part of the bank bailout after the financial crisis of 2008.

13.     HAMP requires banks and loan servicers to offer loan modifications to eligible borrowers with the goal of "reducing [their] mortgage payments to sustainable levels, without discharging any of the underlying debt." *Bosque v. Wells Fargo Bank, N.A.,* 762 F. Supp. 2d 342, 347 (D. Mass. 2011); *see generally* Jean Braucher, Humpty Dumpty and the Foreclosure Crisis: Lessons from the Lackluster

---

[1] Available at https://www.hmpadmin.com/portal/programs/docs/ hamp_servicer/sd0901.pdf, hereby incorporated by reference.

4

First Year of the Home Affordable Modification Program, 52 Ariz. L. Rev. 727,

748–53 (2010) (providing background on HAMP's features). The Secretary of the

Treasury, through Fannie Mae, entered into agreements with numerous home loan

servicers, including Wells Fargo, pursuant to which the servicers "agreed to identify

homeowners who were in default or would likely soon be in default on their

mortgage payments, and to modify the loans of those eligible under the program."

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012). The servicers

are to conduct an initial evaluation of a particular homeowner's eligibility for a loan

modification using a set of guidelines promulgated by the Treasury Department. *Id.*

If the borrower meets those criteria, the guidelines direct the servicer to offer a trial

loan modification as a precursor to obtaining a permanent modification. *Markle v.*

*HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 177 (D. Mass. 2011). If the

borrower complies with the trial modification terms, the servicer must offer the

borrower a permanent loan modification. *See Wigod*, 673 F.3d at 557. Mortgage

servicers receive a $1,000 payment for each permanent modification, in addition to

other incentives. *Wigod*, 673 F.3d at 556.

14.    ASC participates in HAMP. ASC signed a contract with the financial

agent of the U.S. Department of the Treasury in March 2010 establishing its

participation in HAMP.

15.    Under ASC's HAMP contract, it is to receive over $6,400,000,000

($6.4 billion) in taxpayer funds in exchange for its promise that it "shall" provide

eligible homeowners with loan modifications. *See* Wells Fargo Servicer Participation

Agreement, at p. 4.[2]

16.    The investor, U.S. Bank, also participates in HAMP. U.S. Bank signed

a contract with the financial agent of the U.S. Department of the Treasury in August

2009 establishing its participation in HAMP.

17.    Under U.S. Bank's HAMP contract, it is to receive over

$114,000,000 ($114 million) in taxpayer funds for its promise that it also "shall"

provide eligible homeowners with loan modifications. *See* U.S. Bank Servicer

Participation Agreement, at p. 4.[3]

18.    The guidelines for HAMP are contained in a handbook called the

Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages,

Version 4.3 (the "MHA Handbook").[4] The MHA handbook guidelines are

---

[2] Available at http://www.treasury.gov/
initiatives/financialstability/programs/housingprograms/mha/Documents_Contr
acts_Agreements/093010wellsfargobanknaSPA(incltransmittal)-r.pdf, hereby
incorporated by reference.

[3] Available at http://www.treasury.gov/initiatives/financial-
stability/programs/housing-
programs/mha/Documents_Contracts_Agreements/US%20Bank%20National%2
0Association.pdf, hereby incorporated by reference.

[4] Available at
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/
mhahandbook_43.pdf, hereby incorporated by reference.

incorporated by reference into the HAMP contracts. *See* Servicer Participation Agreements at p. 2, § 1.B (stating "Servicer shall perform the Services described in . . . the guidelines and procedures issued by the Treasury . . . .").

19.     The guidelines for HAMP state that homeowners should be provided with loan modifications that reduce their monthly mortgage payments (comprised of principal, interest, taxes, insurance, and homeowners association or condo dues) to 31% of their gross monthly income. This is accomplished by a combination of steps that reduce the mortgage's interest rate, extend the term, and provide a principal forbearance. *See* MHA Handbook, Ch. II, § 6.3 (describing this "waterfall" of steps required to achieve a modified payment). This payment reduction is accomplished by following a series of steps that modifies different aspects of a loan until the target payment is reached. *Id.*

20.     The procedure for a modification is as follows. First, past-due amounts are capitalized, resulting in a new principal balance. Second, the interest rate is reduced by increments of 0.125% to a possible floor of 2.00%. Third, the term of the loan is extended to a maximum of 40 years. And finally, if necessary to reach the Target Payment, a servicer will forbear up to 30% of the recapitalized principal balance, putting it "on the back of the loan" so that the borrower does not pay interest on it. The homeowner must still repay this amount when the loan matures, or when the loan is refinanced or the house sold. In this way, a homeowner who can afford his mortgage can resume payments with a modified monthly payment amount. *See* MHA Handbook, Ch. II, § 6.3.1.

### Newell's Eligibility for a Modification and ASC's Refusal
### To Request Waiver of the Investor Restriction

21.     Newell is eligible for a loan modification based on the HAMP guidelines, as explained below.

22.     ASC solicited Newell by mail on February 27, 2014, offering to consider him for a loan modification if he submitted an application within 30 days.

23.     Within 30 days, Newell submitted an application to ASC. On March 27, 2014, Newell faxed an application to ASC at (866) 590-8910 including a complete package of documents, including financial statement, paystubs, bank statements, and other documents. And, over the next few weeks, Newell timely submitted additional documents requested by ASC related to his wife's income.

24.     The amounts used to calculate Newell's eligibility were as follows:

(a)     Gross monthly income, as calculated by ASC: $6,976;

(b)     Target Payment for a modification (31% of the gross monthly income): $2,163;

(c)     Mortgage principal balance: $150,087.60;

(d)     Arrears: $105,421.20;

(e)     Interest rate: 6.00%; and

(f)     Monthly escrow for property taxes and insurance: $803.83 per month (based on property taxes of $422 per month and insurance of $380.83 per month).

25.     Based on these amounts, Newell's the loan should have been modified as follows. First, the past-due amounts should be capitalized, resulting in a new principal balance of $255,508.80. Second, the interest rate should have been reduced to approximately 3.125%. The term did not need to be extended, and Newell did not need a principal forbearance. These HAMP-mandated steps would have produced the Target Payment of approximately $2,163 per month. Newell was clearly eligible for a loan modification.

26.     But rather than provide Newell with a loan modification, ASC denied his application in writing on April 24, 2014. As grounds for its denial, ASC stated that the loan could not be modified based on a restrictions by the investor, U.S. Bank. The restrictions are contained in the trust document pursuant to which ASC administers the loans on U.S. Bank's behalf. This document is called a Pooling and Servicing Agreement ("PSA"). [5]

27.     The investor's PSA, according to ASC, did not allow interest rate reductions or term extensions. Such modifications to payment terms are required under HAMP.

28.     Indeed, some language in the PSA does appear to prohibit loan modifications. *See* PSA, § 3.05(b), stating "the Servicer may permit a loss mitigation modification of the mortgage loan . . . provided, however, that . . . (4) the final

---

[5] Available through the Securities and Exchange Commission at http://www.sec.gov/Archives/edgar/data/1351906/000116231806000178/m124xcsmc20061psa.htm, hereby incorporated by reference.

maturity date of any mortgage loan shall not be extended, [and] (5) no change to the Mortgage Rate is permissible . . . ."

29.     This restriction, however, is irrelevant and unenforceable because both ASC and U.S. Bank's HAMP contracts were entered into *after* the date of the PSA. The PSA is dated January 2006, whereas ASC and U.S. Bank's HAMP contracts are dated years later, March 2010 and August 2009, respectively. The HAMP contracts and guidelines thus supersede the PSA. The restriction is also invalid as a matter of public policy.

30.     HAMP guidelines are, as a matter of law, the industry standard for mortgage servicing and loan modifications under state and federal law. *See* Helping Families Save Their Homes Act of 2009, Pub. L. 111-12, § 201, 123 Stat. 1639, codified at 15 U.S.C. § 1639a ("The qualified loss mitigation plan guidelines [HAMP] issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute standard industry practice for purposes of all Federal and State laws."). Thus, the violation of HAMP guidelines by failing to provide a modification to an otherwise-eligible borrower like Newell is negligent.

31.     In fact, in the event of an investor restriction, ASC was required under HAMP guidelines to request a waiver of it. The MHA Handbook, Ch. I, § 1.1, states that "participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements" of HAMP.

32.     Such waiver must be requested by the servicer in writing within 30 days of identifying the investor as a non-participant. *See* MHA Handbook, Ch. I, § 1.3 (stating "the servicer must contact the investor in writing at least once, encouraging the investor to permit modifications and other assistance available under the extended and expanded MHA programs.").

33.     Moreover, the investor restriction is not binding on ASC. Mortgage servicers like ASC have what is called "safe harbor" to modify loans under HAMP, even if the modification could be construed as a violation of the investor guidelines under a PSA. *See* 15 U.S.C. § 1639a. Under the safe harbor clause, a mortgage servicer may modify a loan without any liability to the investor.

34.     The purpose of this safe harbor is to encourage and allow modifications for at-risk homeowners like Newell, under programs like HAMP. Safe harbor for modifications is even acknowledged in the MHA Handbook, which states:

> As part of Helping Families Save Their Homes Act of 2009 (HFSTHA), Congress established the Servicer Safe Harbor by amending the Truth in Lending Act for the purpose of providing a safe harbor to enable such servicers to modify and refinance mortgage loans and engage in other loss mitigation activities under a "qualified loss mitigation plan" [HAMP].

MHA Handbook, Ch. I, § 1.2.

35.     So, Newell appealed the denial in May 2014. In his appeal, he asked ASC for documentation that it had requested that the investor, U.S. Bank, waive the

11

restriction. Such a request for a waiver, as explained above, is required under
HAMP.

36.    But in ASC's responses to the appeal, sent May 29 and June 5, 2014,
it admitted that it had made no such request to waive the restriction. Moreover,
ASC asserted that it had no obligation to request a waiver.

37.    The only options ASC provided Newell in its responses were to do a
short sale or to move out and give the deed to his home to ASC.

38.    Left with no other alternatives, on June 27, 2014, Newell sent a
demand to ASC pursuant to G.L. c. 93A, describing his damages and asking for a
reasonable settlement offer, including a modification. (**Exhibit 1**.)

39.    In his demand letter, Newell again notified ASC that it had an
obligation to request that the investor restriction be waived.

40.    ASC finally responded to Newell's demand letter on August 21,
2014, more than 30 days after receiving it. ASC again refused to request a waiver of
the investor restriction, and refused to make a settlement offer.

41.    ASC admits a modification would be in its own financial interest. In a
letter dated May 22, 2014, ASC stated that a loan modification would result in net
profit of $25,003.68. Because a modification would make a profit for all parties
involved, there is no reason for ASC to refuse to modify. ASC is a bank in business to
make a profit.

42.    ASC's refusal to modify Newell's mortgage despite its "safe harbor"
to do so under 15 U.S.C. § 1639a serves no legal or practical purpose. It is merely

an arbitrary or punitive measure it has elected to take against him, despite its ability to modify.

43. Finally, the investor restriction is unenforceable on public policy grounds because the parties' contract to commit unfair practices in no way preempts or supersedes the enforceability of concepts of fundamental fairness under c. 93A.

44. HAMP guidelines require mortgage servicers like ASC to comply with consumer-protection laws prohibiting unfair and deceptive acts and practices, such as Mass. Gen. Laws ch. 93A. *See* MHA Handbook, Ch. I, § 1.6 (requiring servicers to "fully comply with all federal, state, and local laws" including laws prohibiting "unfair or deceptive acts or practices . . . ."). *See, e.g., Okoye v. Bank of N.Y. Mellon*, No. 10-11563-DPW, 2011 WL 3269686, at *7 (D. Mass. July 28, 2011) ("consumer protection statutes—and Massachusetts's broadly interpreted Chapter 93A in particular—have become an attractive alternative means of attempting to recover for alleged HAMP violations where no action is otherwise available.").

45. Courts throughout the District of Massachusetts have uniformly held that although there is no independent right of action under HAMP itself, violations of HAMP that violate state or federal law are actionable under G.L. c. 93A. *See Marquez v. Wells Fargo Bank, N.A.*, No. 12-11725-RGS, 2012 WL 5457343, 3, Slip Copy (D. Mass. Nov. 8, 2012) ("while HAMP does not provide a private right of action, violations of HAMP guidelines may, under certain circumstances, provide a basis for recovery under Chapter 93A.").

13

46.     It has been recognized that Newell's loan was handled incorrectly. In 2011, Newell was notified that he qualified for entrance in to the lottery for foreclosure assistance under the Emergency Homeowners' Loan Program, which would have allowed him to reinstate his loan. But because of the amount of arrears that ASC had caused to accrued, he was unable to qualify. And as part of the federal Independent Foreclosure Review, Newell was awarded payment of $1,000 related to "deficient mortgage servicing and foreclosure processes."

### Newell's Prior Litigation Against ASC

47.     Newell previously filed suit against ASC and made similar allegations in the case of *Newell v. America's Servicing Company*, District of Massachusetts, civil action no. 1:13-CV-11141-RGS. That action was dismissed on September 9, 2013 after Rule 12(b)(6) motion to dismiss filed by ASC.

48.     The claims against ASC in the current case, however, arise from conduct that it engaged in *subsequent* to the dismissal. Newell's current claims, therefore, are properly before this Court. There is no res judicata issue regardless of whether ASC may rely on the prior dismissal as having a preclusive effect as to Newell's new claims.

### Harmon Deceptively Stated that Newell's Loan was Accelerated

49.     Harmon is the foreclosure firm that represents ASC and U.S. Bank in connection with the foreclosure of Newell's home. Although foreclosure has been initiated, no sale has yet been conducted.

50.    A loan may not be accelerated until the borrower receives the "right to cure" notice pursuant to G.L. c. 244, § 35A. The notice must provide the borrower with numerous disclosures. G.L. c. 244, §§ 35A(g), (h)(1)–(10).

51.    Among the disclosures, the notice must comply with the following:

(a)    The notice must be sent by the "mortgagee." *See* G.L. c. 244, § 35A(g);

(b)    The notice must contain the sum of money required to cure the default. *See* G.L. c. 244, § 35A(h)(1); and

(c)    The notice must state that if the homeowner does not cure the default, the mortgagee or anyone holding thereunder may take steps to terminate the homeowner's ownership of the property by a foreclosure proceeding or other action to seize the home. *See* G.L. c. 244, § 35A(h)(3).

52.    On November 29, 2010, ASC sent a purported "right to cure" notice that did not contain the disclosures required under G.L. c. 244, §§ 35A(g), (h)(1), and (h)(3) explained in the above paragraph. (**Exhibit 2.**)

53.    Then, on May 17, 2011, Harmon sent a letter to Newell stating that "the note is hereby accelerated . . . ." (**Exhibit 3.**)

54.    But until a proper notice is sent, the loan may not be accelerated. *See U.S. Bank Nat'l Ass'n v. Schumacher*, 467 Mass. 421 (2014).

55.    So, because the "right to cure" letter was deficient, Newell's loan could not legally be accelerated by Harmon.

15

56.     Thus, Harmon's statement that the loan "is hereby accelerated," therefore, was untrue, deceptive, and misleading.

57.     Furthermore, in its letter, Harmon attempted to collect the debt from Newell, telling him that:

(a)     That "entire balance is due and payable forthwith";

(b)     He owed "$150,087,60 in principal and $22,496.30 in interest and other charges for a total of $172,583.90"; and

(c)     Stating **"PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE"** (bold and capitalization in original).

58.     Newell was damaged by Harmon's unfair business practices because he suffered the risk of loss of his home to an unnecessary and unauthorized foreclosure, he was assessed "attorney's fees and costs" as stated in Harmon's letter, he suffered emotional distress and anxiety at the prospect of losing his home unlawfully, his right to have his loan accelerated lawfully was invaded and caused premature acceleration, and he incurred costs and attorney fees in connection with defending against the invasion of his rights.

59.     Newell mailed Harmon a demand letter pursuant to G.L. c. 93A on October 4, 2013 in which he described his damages and asked for a reasonable offer of settlement. (**Exhibit 4**.)

60.     Harmon failed or refused to make a reasonable settlement offer in response to Newell's demand.

## COUNT I
## Consumer Protection Act, G.L. c. 93A, § 9
### (ASC)

61.     The preceding allegations are incorporated by reference.

62.     Newell is a consumer not entitled to file a claim under G.L. c. 93A, § 11. The mortgage at issue was incurred for family and household purposes as it was on his principal residence.

63.     ASC committed unfair and deceptive acts and practices against Newell, as described throughout the complaint.

64.     Newell mailed ASC a demand letter pursuant to G.L. c. 93A on June 27, 2014 in which he described his damages and asked for a reasonable offer of settlement. (**Exhibit 1.**)

65.     ASC failed or refused to make a reasonable settlement offer in response to Newell's demand.

66.     Newell was damaged as a result of ASC's conduct. His damages include, but are not limited to, emotional distress and mental anguish, anxiety and anger, loss of the economic benefits of a loan modification, damage to his credit, accrued interest and late fees, costs and attorney fees, and delay in the opportunity to receive a loan modification.

17

## COUNT II
### Consumer Protection Act, G.L. c. 93A, § 9
### (Harmon)

67.   The preceding allegations are incorporated by reference.

68.   Harmon committed unfair and deceptive practices against Newell, as described throughout the complaint.

69.   Newell mailed Harmon a demand letter pursuant to G.L. c. 93A on October 4, 2013 in which he described his damages and asked for a reasonable offer of settlement. **(Exhibit 4.)**

70.   Harmon failed or refused to make a reasonable settlement offer in response to Newell's demand.

71.   Newell was damaged as a result of Harmon's conduct. His damages include, but are not limited to, confusion as to his rights with regard to acceleration of the mortgage, accrual of costs and attorney fees, late fees, and invasion of his interest in having true and accurate information conveyed to him about the status of his mortgage.

### REQUEST FOR RELIEF

WHEREFORE, plaintiff Bryan P. Newell requests the following relief:

a)  Judgment in his favor and against defendants ASC and Harmon;

b)  Actual and compensatory damages;

c)  Treble damages, costs, and attorney fees;

d)  An order that ASC provide Newell with a loan modification compliant

   with all applicable HAMP, federal, Massachusetts, or other applicable

   guidelines; and

e)  All other relief that may be awarded at law or in equity.

### JURY DEMAND

Bryan P. Newell hereby requests a trial by jury on all issues so triable.

Respectfully submitted,

Josef C. Culik (BBO #672665)
CULIK LAW PC
18 Commerce Way, Suite 2850
Woburn, Massachusetts 01801
(617) 830-1795
(617) 830-1576 Fax
jculik@culiklaw.com

Attorney for Plaintiff Bryan P. Newell

December 10, 2014

19

# CULIK LAW PC

Champion Your Rights®

18 COMMERCE WAY, SUITE 2850
WOBURN, MASSACHUSETTS 01801

P  (617) 830 1795
F  (617) 830 1576

culiklaw.com

June 27, 2014

**EXHIBIT**
**1**

VIA FIRST-CLASS AND CERTIFIED MAIL

Richard K. Davis, Pres. & CEO
U.S. Bank National Association, as Trustee
425 Walnut Street
Cincinnati, OH  45202

John Stumpf, Chairman & CEO
America's Servicing Company
A Division of Wells Fargo Bank, N.A.
101 N. Phillips Avenue
Sioux Falls, SD  57104

Re:   **Demand for Settlement Offer Pursuant to M.G.L. ch. 93A**

Messrs. Davis and Stumpf:

This is a demand for relief pursuant to the Massachusetts Consumer Protection Act,
M.G.L. ch. 93A, § 9, on behalf of Bryan P. Newell ("Newell") of 16-18 Edgemere Road,
Quincy, Massachusetts 02169. You are required to respond to this demand within 30 days
or else you may be liable for an award of actual and punitive damages, costs, and
attorney's fees under Massachusetts law.

As you know, U.S. Bank, as Trustee[1] ("U.S. Bank") is the investor who claims to own
Newell's mortgage, and America's Servicing Company ("ASC") is the servicer. Newell's
mortgage loan number is 1205271009. At all relevant times, ASC has acted as agent of
U.S. Bank with respect to Newell. Collectively, U.S. Bank and ASC shall be referred to
as the "Banks."

---

[1] U.S. Bank National Association, as Trustee for Credit Suisse First Boston Mortgage Acceptance Corp.
Mortgage Pass-Through Certificates, Series 2006-1.

12.    On May 19, 2014, another ASC representative stated that the written denial would be provided, although none was.

13.    On May 20, 2014, despite having no written denial explaining the reasons for the ASC's decision, my office sent an appeal notice to ASC requesting: (1) documentation that the investor waiver had been requested; (2) a copy of the written denial notice; (3) additional time to appeal the denial; (4) an explanation from ASC of how a modification was "unaffordable" – ASC's rationale for the denial – when Newell could clearly afford a modified payment; and (5) the Net Present Value analysis.

14.    On May 22, 2014, ASC provided a disclosure pursuant to 209 Code Mass. Regs. § 56.05(6) which was defective, as explained below.

15.    On May 29, 2014, ASC provided notice that it had considered the appeal and refused to change its decision.

16.    On June 5, 2014, ASC stated that the investor who owns Newell's loan does not allow term extensions or interest rate reductions, changes to the loan that would be required for any modification.

Additional facts are provided below as applicable.

### B.  ASC and U.S. Bank's Unfair and Deceptive Practices

The Banks' actions as explained below violated M.G.L. ch. 93A. First, based on Newell's income, he can afford a modified mortgage. His gross monthly income as calculated by ASC is approximately $6,976. As of the most recent information available, the principal balance on the mortgage is approximately $150,087.60. There is approximately $94,603.60 in arrears. The interest rate is 6%. The monthly escrow for taxes and insurance is approximately $842.58. These figures show that if the arrears were capitalized onto the principal balance, Newell's income would sustain a mortgage payment at the market rate. Nevertheless, ASC denied Newell's application and refused to provide him with a conforming modification.

Second, even though both ASC and U.S. Bank are being paid millions of taxpayer dollars in exchange for their promise that they "shall" perform loan modifications under the federal Home Affordable Modification Program, they have nevertheless denied Newell's applications for a loan modification citing "investor restrictions." But because both the Banks participate in HAMP pursuant to servicer participation agreements, and because these agreements supersede the investor guidelines, any restrictions are inapplicable.

3

Indeed, the agreements[2] state in mandatory language that the Banks "shall perform" loan modifications for at-risk borrowers.

Third, even if there were applicable investor restrictions (which is disputed above), the Banks failed to request permission from the investor to perform the modification, as required under federal guidelines. Specifically, under the HAMP program, if a purported investor restriction would prevent a loan modification, the mortgage servicer must request a waiver from the investor in order to perform such a modification. *See* MHA Handbook v4.3, Ch. I, § 1.3 ("the servicer must contact the investor in writing at least once, encouraging the investor to permit modifications"). These guidelines constitute standard industry practice under 15 U.S.C. § 1639a, and thus the failure to request the waiver constitutes, at least, negligence. Newell requested documentation that such a waiver had been requested, but no response was provided.

Fourth, the investor guidelines do not prevent the Banks from performing a loan modification on Newell's eligible loan. Under amendments to the Truth in Lending Act, a mortgage servicer may provide a loan modification notwithstanding any investor guidelines. *See* 15 U.S.C. § 1641a(b). As explained in *Ford v. Aurora Loan Services, LLC*, CV-11-5626-GHK EX, 2011 WL 11650616 (C.D. Cal. 2011), this statute "protects loan servicers who engage in modification activities from liability." (citing *Jones v. Premier One Funding*, No. C-09-3858 SC, 2010 WL 841277, at *3 (N.D. Cal. Mar. 10, 2010)).

Fifth, the Banks admit that a loan modification would be in their own financial interest. On the May 22, 2014 correspondence to Newell, the Banks admitted that a modification under HAMP Tier 1 had a positive Net Present Value, meaning that a modification would be more profitable than foreclosure. Despite this, the Banks denied Newell's loan-modification application, a punitive and unreasonable act with neither a moral nor an economic rationale. And upon further review, it appears that a loan modification would provide an even more significant benefit to the Banks, as a loan modification would provide total payments of $429,226 over the life of the loan, in interest over the life of the loan,[3] while a foreclosure would only realize approximately $244,691 (the amount of the approximate payoff) for the Banks, based on their appraisal from May 2014.

---

[2] ASC and US Bank's servicer participation agreements are publicly available online through the U.S. Department of the Treasury at http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Pages/contracts.aspx.

[3] This is calculated by taking the principal of $150,087.60, adding it to the arrears of approximately $94,603, which would create a new loan of $244,590, and then amortizing the loan over 30 years at the current Freddie Mac PMMS a rate of 4.17%. The interest alone over the term of a new loan would equal approximately $184,536.

Sixth, in their denial of Newell's application for a loan modification, the Banks failed to provide the information required under the Massachusetts Division of Banks regulations at 209 Code Mass. Regs. § 56.05(6). This regulation requires a bank to provide the following disclosures when responding to a request for a loan modification.

> (a) a written statement of the borrower's income, debts, assets and obligations as determined by the creditor;
> (b) the creditor's net present value analysis of a modified mortgage loan;
> (c) the creditor's anticipated net recovery at foreclosure;
> (d) a statement of the interests of the creditor; and
> (e) a modified mortgage loan offer or a notice that no modified mortgage loan will be offered.

Yet in the Banks' responses dated May 22, 2014, they failed to respond to provide at least three of these disclosures, as follows: failing to respond to (a), stating that Newell's income was "$N/A"; failing to respond to (c), stating that the anticipated net recovery was "$N/A"; and failing to provide a coherent response to (d), stating that "Your loan is not eligible" for a modification, rather than explaining the creditor's interest in a modification. The Banks' statements are confusing and misleading.

## C.  Newell's Damages

As a result of the Banks' foregoing wrongful actions, Newell has suffered numerous damages.

- Assessment of foreclosure interest, fees, and foreclosure costs in the amount of the arrears, $94,603.60;

- Emotional distress damages from the stress, anxiety, and other physical and mental manifestations of Newell's upset as a result of the Banks' actions, in the amount of $50,000;

- Negative credit reporting; and

- Attorney fees in the amount of $19,000.

Accordingly, I request that you make a reasonable offer of settlement, which offer should include a permanent loan modification and compensation for Newell's damages.

Very truly yours,

Josef C. Culik
Attorney at Law

cc:     Bryan P. Newell



**ASC**
AMERICA'S SERVICING COMPANY

**P.O. Box 1225**
**Charlotte, NC  28201-1225**

**EXHIBIT**
**2**

Date: 11/29/2010

BRYAN P NEWELL
TRACEY A. NEWELL
16 EDGEMERE RD
QUINCY, MA 02169

"This is an important notice concerning your right to live in your home.  Have it translated at once."

Dear Borrower(s)                              Re:  106/1205271009

Our records indicate that your loan is in default.  Unless the payment on your loan can be brought current by 4/28/2011 it will become necessary to accelerate your Mortgage and pursue the remedies provided for in your Mortgage.  The total delinquency against your account as of today's date is as follows:

| | | |
|---|---|---|
| Past Due Payments | $ | 13,797.54 |
| Late Charge Balance | $ | 230.24 |
| Other Fees | $ | 930.00 |
| Suspense Balance | $ | .00 |
| Total Delinquency as of 11/29/2010 | $ | 14,957.78 |

To avoid the possibility of acceleration, you must pay this amount plus any additional monthly payments, late charges and other charges that may be due under applicable law after the date of this notice and on or before 4/28/2011 in CERTIFIED funds, to America's Servicing Company, 1200 W 7th Street, Suite L2-200, Los Angeles, CA 90017, (1-800-842-7654).

If funds are not received by the above stated time, we will proceed with acceleration.  Once acceleration has occurred, we may take steps to terminate your ownership in the property by a foreclosure proceeding or other action to seize the home or pursue any other remedy permitted under the terms of your Mortgage.

If you would like to discuss the present condition of your loan or if you disagree that a default has occurred or the amount of the default, please contact our LOAN SERVICE REPRESENTATIVES at 1-800-842-7654, Monday through Friday from 8:00 A.M. to 8:00 P.M. Central Time.

Financial assistance may be available to you from the Homeownership Preservation Foundation or other foreclosure counseling agency.  Below is a list of agencies that you may wish to contact or ascertain whether you qualify for assistance.

| | |
|---|---|
| Homeownership Preservation Foundation | (888) 995-4673 |
| HUD Approved Housing Counseling | (800) 569-4287 |
| Veterans Administration | (800) 827-1000 |

05/20/2011  14:35    17813311465                STAPLES 1294                          PAGE  02/03

## HARMON LAW OFFICES, P.C.

150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
TEL (617) 558-0500
FAX (617) 244-7304

*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*



**EXHIBIT 3**

May 17, 2011

Mr. Bryan P. Newell
16 Edgemere Road
Quincy, MA 02169-4405

RE:    Mortgage on 16-18 Edgemere Road, Quincy, Massachusetts

Dear Mr. Newell:

This office has been retained by America's Servicing Company -- SC to foreclose on a mortgage dated September 30, 2005 from Bryan P. Newell and Tracey A. Newell to SLM Financial Corporation, in the original principal amount of $160,000.00. Our client informs us that you are in breach of the conditions of the loan documents. We have been instructed to bring a foreclosure in the name of US Bank National Association, as Trustee for Credit Suisse First Boston 2006-1 under the Power of Sale contained in your mortgage and by entry. You are further notified that the note is hereby accelerated and the entire balance is due and payable forthwith and without further notice. Even though the note has been accelerated, you may still have the right to reinstate the loan. If so, and if you desire to reinstate the loan, you will need to pay an amount of money sufficient to bring the loan fully current.

Under the terms of the note and mortgage, there is outstanding through the date of this letter $150,087.60 in principal and $22,496.30 in interest and other charges for a total of $172,583.90. Furthermore, attorney's fees and costs and other charges will continue to accrue pursuant to the terms of the loan documents.

The amount necessary to reinstate or pay off the loan changes daily. You may order a reinstatement or payoff 24 hours a day on-line by going to www.hloreinstatement.com or to www.hlopayoff.com. Please follow the instructions contained on the web page. Please note that only requests made by owners, borrowers, mortgagors and authorized parties will be processed. You may also contact us during business hours to request a reinstatement or payoff by calling (617) 558-0598. When completing the on-line form or when calling our office, please reference your Case Number 201105-0532 so that we may process your request more quickly.

Unless you, within thirty days after receipt of this notice, dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by this office. If you notify this office in writing within the thirty-day period that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by this office. Upon your written request within the thirty-day period, this office will provide you with the name and address of the original creditor, if different from the current creditor.

The law does not require this office to wait until the end of the thirty-day period before proceeding with legal action to collect the debt. However, if you notify this office in writing within the thirty-day period described in the previous paragraph that the debt, or any portion thereof, is disputed, or that you request the name and address of the original creditor, this office shall cease collection of the debt, or any disputed portion thereof, until this office obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to you by this office.

Your failure to dispute the validity of the debt may not be construed by any court as an admission of liability by you.

Very truly yours,

Andrew P. Osofsky, Esquire

APO/CGS/201105-0532

**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

# CULIK LAW PC

Champion Your Rights®

18 COMMERCE WAY, SUITE 2850
WOBURN, MASSACHUSETTS 01801

P  (617) 830 1795
F  (617) 830 1576

culiklaw.com

October 4, 2013

**EXHIBIT**
**4**

VIA CERTIFIED MAIL

U.S. Bank National Association, as Trustee
Attn: Richard K. Davis, Pres. & CEO
425 Walnut Street
Cincinnati, OH  45202

Harmon Law Offices, P.C.
Attn: Mark P. Harmon, Pres.
150 California Street
Newton, MA  02458



Certified Article Number

7195 9008 9090 2092 5294

SENDERS RECORD

Re:     **Settlement Demand Pursuant to Consumer Protection Act**

Dear Sirs:

This is a demand for relief pursuant to the Massachusetts Consumer Protection Act,
Mass. Gen. Laws c. 93A, § 9, on behalf of Bryan P. Newell ("Newell") of 16-18
Edgemere Road, Quincy, Massachusetts 02169. From at least November 2010, Harmon
Law Offices, P.C. ("Harmon") was retained by America's Servicing Company ("ASC"),
a division of Wells Fargo Bank, N.A., to foreclose on Newell's mortgage loan "in the
name of US Bank National Association, as Trustee for Credit Suisse First Boston 2006-
1." Since March 2006, ASC serviced Newell's loan, by itself and through counsel, with
loan no. 106-1205271009, purportedly on behalf of U.S. Bank National Association, as
Trustee for Credit Suisse First Boston Mortgage Acceptance Corp. Mortgage Pass-
Through Certificates, Series 2006-1 ("US Bank"). US Bank is thus liable under agency
principles.

You are required to respond to this demand within 30 days or else you may be liable for an
award of punitive damages, costs and attorney's fees under Massachusetts law. This

demand is related to your companies' failure to comply with Massachusetts state foreclosure laws and the terms of the underlying mortgage. Specifically, US Bank accelerated Newell's mortgage debt without first complying with its pre-acceleration duties imposed by the terms of the mortgage itself and by state foreclosure laws for failing to first send Newell compliant notice of his right to cure the default, which is a violation of Chapter 93A. Additionally, Harmon's acceleration notice thus violates federal debt collection laws for falsely representing the amount, character and legal status of the debt, which is also a violation of Chapter 93A.

### Newell's Mortgage and Background

Newell obtained his refinancing in 2005 with a note and loan for $160,000 from SLM Financial Corporation ("SLM"). The note was secured by a mortgage from Newell in favor of SLM on September 30, 2005. The mortgage, at paragraph 22 states:

> Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.

*See* Mortgage, Norfolk ROD, book 22973, page 529.

The mortgage defines the term "Lender" at Definitions, (C) as:

> "Lender" is SLM FINANCIAL CORPORATION.
> Lender is a CORPORATION, organized and existing under the laws of DELAWARE. Lender's address is 90 LIBBEY PARKWAY, SUITE 100 WEYMOUTH, MA 02189.
> Lender is the mortgagee under this Security Instrument.

*See* Mortgage, Norfolk ROD, book 22973, page 519.

Newell fell behind on his mortgage due to reduced hours at work. He is now, however, gainfully employed and can afford to resume a modified mortgage payment. Newell has been trying since 2010 to modify his loan, but ASC maintains that Newell's mortgage

2

cannot be modified due to investor restrictions in the Credit Suisse First Boston
Mortgage Acceptance Corp. Mortgage Pass-Through Certificates, Series 2006-1 Trust.
To date, Newell has received no documentation that ASC ever requested permission
from US Bank, as Trustee, to modify the loan notwithstanding the restrictions. *See
Mitchell v. Wells Fargo Bank, N.A.*, 2012 WL 2974781, at *16 (Bankr. D. Mass. Jul. 20,
2012) ("it is the owner or investor, not the servicer bank, who has final word on whether
to modify a loan.").

### Your Companies' Unfair and Deceptive Acts and Practices

On March 7, 2010, ASC sent a letter demanding $6,032.83 in certified funds on or before
April 6, 2010 to avoid acceleration of the loan. The March 7, 2010 letter purportedly was
sent to comply with Mass. Gen. Laws c. 244, § 35A as well as paragraph 22 of the
Mortgage itself. ASC identified "U.S. Bank National Association, Trustee CSMC
Mortgage-Backed Pass-Through Certificates, Series 2006-1" as the current mortgagee.
However, per the Mortgage terms, the *Lender*, here SLM, was required to send pre-
acceleration notice. *See* Mortgage, ¶ 22, Norfolk ROD, book 22973, page 529. *See also*
M.G.L. c. 183, § 21 (allowing mortgagee to foreclose by "complying with the terms of the
mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of
a power of sale"); *U.S. Bank Nat'l Assoc. v. Ibanez*, 458 Mass. 637, 646-47 (2011) ("'one
who sells under a power [of sale] must follow strictly its terms. If he fails to do so there is
no valid execution of the power and the sale is wholly void.'") (quoting *Moore v. Dick*, 187
Mass. 207, 211 (1905)).

Further, ASC's letter did not comply with M.G.L. c. 244, § 35A ("Section 35A")[1] for a
number of reasons, including that:

(1) it was sent by ASC, which was neither the mortgagee nor one holding
thereunder, in violation of Section 35A(b);

(2) it only provided 30 days to cure the default, in violation of Section 35A(a);

(3) it failed to provide a "local or toll-free telephone number of a person to whom
the payment or tender shall be made," in violation of Section 35A(c)(2);

(4) it failed to provide the telephone number for the mortgagee's representative to
whom Newell could contact if he disagreed with the assertion that default occurred or

---

[1]     *See* An Act Protecting and Preserving Home Ownership, 2007 Mass. Acts 206, § 11
(codified at *Mass. Gen. Laws* ch. 244, § 35A (2008)).

"the correctness of the mortgagee's calculation of the amount required to cure the default," in violation of Section 35A(c)(3);

(5) it failed to identify the "current and former mortgage broker or mortgage originator," in violation of Section 35A(c)(5); and

(6) it failed to inform Newell that he "may be eligible for assistance from the Massachusetts Housing Finance Agency and the division of banks" along with the local or toll-free numbers to call for assistance from those agencies, in violation of Section 35A(c)(6).

*See* M.G.L. c. 244, § 35A (2008); *Ibanez*, 458 Mass. at 646-47, 655. Additionally, while the March 7, 2010 letter identified US Bank as the mortgagee for Newell's loan, assignment for Newell's loan was not executed until June 11, 2012, *infra*. Finally, it is unclear whether the $30.00 in "Other Fees" includes any unlawful "charge, fee, or penalty attributable to the exercise of the right to cure a default" or attorneys' fees relating to the default, in violation of Section 35A(d).

On March 21, 2010, ASC sent a second letter demanding $4,041.48 in certified funds on or before April 20, 2010 to avoid acceleration of the loan. The March 21, 2010 letter again failed to comply with the terms of the Mortgage or Section 35A, and only served to confuse the matter further because while it was mailed two weeks later it demanded approximately two thousand dollars less to reinstate the mortgage loan.

On November 29, 2010, ASC sent a third letter demanding $14,957.78 in certified funds on or before April 28, 2011 to avoid acceleration of the loan. The November 2010 letter again failed to comply with the terms of the Mortgage because the pre-acceleration notice needed to be sent by the *Lender*, at that time still SLM. While the November 2010 letter complied with revised Section 35A[2] in providing Newell 150 days to cure the default, it still did not comply because:

(1) it was still sent by ASC, neither the mortgagee nor one holding thereunder, in violation of Section 35A(g);

(2) it failed to contain the sum of money required to cure the default, in violation of Section 35A(h)(1); and

---

[2]     *See* M.G.L. ch. 244, § 35A (2010).

4

(3) it failed to identify that the mortgagee, SLM, may take steps to terminate Newell's ownership in the property, in violation of Section 35A(h)(3).[3]

*See* M.G.L. c. 244, § 35A (2008); *Ibanez*, 458 Mass. at 646-47, 655. Finally, it is unclear whether the $930.00 in "Other Fees" included any unlawful "charge, fee, or penalty attributable to the exercise of the right to cure a default" or attorneys' fees relating to the default, in violation of Section 35A(i). On November 29, 2010, ASC under separate cover also returned the Newells' $1,991.35 check and referred them to discuss their loan with its attorneys, Harmon.

On May 17, 2011, Harmon sent Newell a letter confirming that the note was thereby accelerated and it was retained by ASC to foreclose "in the name of US Bank National Association, as Trustee for Credit Suisse First Boston 2006-1." The Harmon acceleration notice further stated that the reinstatement or payoff figure changed daily and could be requested online, or by calling Harmon and referencing Case Number 201105-0532. Where US Bank failed to comply with the terms of the mortgage and state foreclosure laws before accelerating the loan, the May 2011 acceleration was unlawful and should be rescinded for all the reasons set forth at length, *supra*.

Harmon's November 2011 letter also falsely stated that "[t]he law does not require this office to wait until the end of the thirty-day period before proceeding with legal action to collect the debt." Where your companies failed to comply with the terms of the mortgage and state foreclosure laws, as outlined at length *supra*, acceleration of the loan was premature and your companies lacked any standing or authority to proceed with any legal action or contractual or statutory power of sale to collect the debt. Thus, Harmon's letter violates 15 U.S.C. §§ 1692e(2)(A), 1692e(4), and 1692e(5) for falsely stating that the debt was accelerated and legal action would proceed where the acceleration was unlawful because US Bank failed to comply with pre-acceleration duties imposed by the terms of the mortgage and state foreclosure laws. *See Crossley v. Lieberman*, 868 F.2d 566, 570-71 (3d Cir. 1989). These unfair and deceptive acts are *per se* violations of Chapter 93A, and Newell's injury includes unlawful acceleration of his loan as well as premature ad unauthorized foreclosure fees and costs assessed to his account. *See gen. McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 911 F. Supp. 2d 1 (D. Mass. 2012); M.G.L. c. 93A, § 2.

---

[3]     Newell lacks sufficient information or belief to assert whether the November 2010 letter complied with Sections 35A(h)(5), (h)(7), (h)(8) and (h)(9), and thus reserves his right to assert further violations of those subsections upon further investigation.

On June 11, 2012, SLM Financial Corporation purportedly assigned Newell's mortgage to US Bank, as Trustee. The assignment was recorded in the Norfolk County Registry of Deeds at book 30100, page 72 on June 21, 2012. US Bank became trustee for the mortgagee of Newell's loan in June 2012. *See Ibanez*, 458 Mass. at 654 ("Because an assignment of a mortgage is a transfer of legal title, it becomes effective with respect to the power of sale only on the transfer; it cannot become effective before the transfer.") (citing *In re Schwartz*, 366 B.R. 265, 269 (Bankr. D. Mass. 2007)). Thus, all prior attempts to foreclose on Newell's loan and failed attempts to comply with the terms of the mortgage and state foreclosure laws to begin the statutory power of sale were void, including US Bank National's SCRA action in the Land Court, No. 12 MISC 473825 filed November 14, 2012.

As you are aware, a foreclosing mortgagee is required to strictly comply with the power of sale, including all foreclosure statutes, pursuant to M.G.L. ch. 183, § 21, and existing precedent. *See Ibanez*, 458 Mass. at 646-67, 655 (failing to apply its ruling prospectively because "[t]he legal principles and requirements [for foreclosing mortgagees] we set forth are well established in our case law and our statutes. All that has changed is the plaintiffs' apparent failure to abide by those principles and requirements in the rush to sell mortgage-backed securities.").

"[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are [] declared unlawful" under Mass. Gen. Laws c. 93A, Section 2. *See* M.G.L. c. 93A, § 2(a). The Supreme Judicial Court also held that otherwise lawful acts may violate Mass. Gen. Laws c. 93A if those acts are unfair or deceptive. *See Schubach v. Household Fin. Corp.*, 375 Mass. 133, 137 (1978) (rejecting the argument that an act or practice that is authorized by statute "can never be an unfair or deceptive act or practice."). "Customer service is [US Bank's] first priority."[4] US Bank also signed a consent order with its federal regulator in 2011 pledging to adequately staff and oversee its foreclosure processes and operations, as well as loss mitigation evaluations. *See In the Matter of U.S. Bank Nat'l Assoc.*, No. AA-EC-11-18 (OCC Mar. 31, 2013).[5] Thus, Newell requests that US Bank honor its commitments to its customers and federal regulator, and comply with state foreclosure law by also reviewing his loan for foreclosure alternatives before re-accelerating the note or foreclosing on the property.

---

[4] Available at http://www.usbank.com/mortgage/existing-customer.html.
[5] Available at http://occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

*Newell's Injuries Due to Your Companies' Unfair and Deceptive Acts and Practices*
Your companies' unfair and deceptive acts outlined above have caused: risking the loss of
Newell's home to an unnecessary and unauthorized foreclosure; unauthorized
foreclosure costs to his account; title to his home to be slandered by companies who lack
valid assignment and authority to foreclose; and caused him to incur legal costs and fees
in his attempt to get Harmon and US Bank to comply with state foreclosure laws and the
terms of the mortgage itself.

Newell thus demands that his loan be de-accelerated, due to your companies' failure to
comply with state law and the terms of the mortgage regarding the necessary pre-
acceleration notices and duties. In addition, to the extent US Bank National's SCRA
action in the Land Court, No. 12 MISC 473825 filed November 14, 2012, relied upon or
involved an affidavit certifying compliance with the terms of the mortgage or state
foreclosure laws in order to begin foreclosing by contractual or statutory power of sale,
US Bank lacked standing and authority to so certify at that time.

Finally, Newell is still willing and able to resume making modified monthly mortgage
payments in order to keep his family home. Thus, while US Bank could re-start the
foreclosure process and Newell will ensure that it follows the letter of the law in so doing,
he requests that US Bank review him for a loan modification and grant ASC or any other
mortgage servicer the authority to modify his loan despite investor restrictions in the trust
because US Bank is "a leader in the mortgage industry"[6] that participates in the federal
Making Home Affordable Program to help homeowners keep their homes.

Therefore, I request that you make a reasonable settlement offer to justly and fairly
compensate Bryan P. Newell for the harm you have caused him. I look forward to your
response.

Very truly yours,

Danielle M. Spang
Attorney at Law

Encl.
cc:     Bryan P. Newell

---

[6] Available at http://www.usbank.com/mortgage/index.html.